# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MALCOM MAXWELL RYIDU-X, SID
  # 896073, formerly known as Richard Janey,  *

Plaintiff                     *

v                           *      Civil Action No. CCB-18-2213
                                (Consolidated with CCB-18-2641)

ECI WARDEN RICKY FOXWELL,    *
MARYLAND DIVISION OF CORRECTION,[1]
COMMISSIONER OF CORRECTION,   *
JOHN DOE # ONE,
MCI-H WARDEN DENISE GELSINGER,[2]  *
ACTING WARDEN JOHN DOE # TWO,
CHAPLAIN FELTON,              *
LIEUTENANT DUNAWAY,
OFFICER JONES,                *
OFICER ALLEN,
SERGEANT WILSON,            *
LIEUTENANT ATKINS,
                              *

Defendants

\*\*\*

## MEMORANDUM OPINION

On July 18, 2019, Maryland prisoner Malcom Ryidu-X ("Plaintiff" or "Ryidu-X") filed a

"Motion for Emergency Injunction" seeking to enjoin "Maryland State prison officials" at Eastern

---

[1] Ryidu-X names the Maryland Division of Correction ("DOC") as a party to suit. Under the authority conferred by 28 U.S.C. § 1915(e)(2)(B)(iii), the Court dismisses this Defendant under the doctrine of sovereign immunity, which precludes a private individual not only from suing an nonconsenting State in federal court, but also extends to an instrumentality of a State (also referred to as an "arm of the state"), absent waiver or Congressional abrogation. *See Pennhurst State School & Hospital*, 465 U.S. 89, 101–02 (1984) (explaining that absent consent, a suit in which the State or one of its agencies or departments is named a defendant is proscribed by the Eleventh Amendment); *see also Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013). Although Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code, State Gov't. Art., § 12-201(a), it has not waived its immunity under the Eleventh Amendment to a suit of this kind in federal court.

[2] The Clerk shall amend the docket to reflect the spelling of Defendants' names and the inclusion of Defendants listed in the caption of the Complaint filed in Civil Action No. CCB-18-2641.

Correctional Institution ("ECI") from an "on-going campaigne [sic] of discrimination and harassment" against him. Ryidu-X named only ECI Warden Ricky Foxwell in his pleading, complaining that he had been unable to purchase personal hygiene items from the prison commissary and that Foxwell denied him the ability to practice his religion as a Muslim unless Ryidu-X "converts" from the Shi'a to Sunni Muslim faith.[3] *See Ryidu-X v. Foxwell,* Civil Action No. CCB-18-2213 (D. Md.), ECF No. 1.[4] The submission, docketed as a Complaint, was incomplete and Ryidu-X was ordered to supplement his pleading to include a full filing fee or Motion to Proceed in Forma Pauperis. ECF No. 2. He complied, ECF No. 3, and counsel for Defendants was ordered to respond to the complaint, ECF No. 4.

On August 27, 2019, the Clerk received a new civil rights action docketed as *Ryidu-X v. Doe, et al.,* Civil Action No. CCB-18-2641 (D. Md.). Ryidu-X reiterated his allegations against Foxwell regarding the denial of worship and a lack of hygiene supplies and named ECI staff alleged to be carrying out Foxwell's edicts and denying him access to writing supplies and other property approved for sale via catalog. The Complaint further alleged the improper denial of religious practices and prayer materials[5] by policy-makers with the Division of Correction

---

[3] The parties provide no information concerning the two branches of Islam, but the beliefs and practices of the two faiths differ. *See, e.g.,* Jennifer K. Beaudry, *Islamic Sectarianism in United States Prisons: The Religious Right of Shi'a Inmates to Worship Separately from their Fellow Sunni Inmates,* 35 HOFSTRA L. REV. 1833, 1852 (2007). Sunni Muslims, the majority group, believe that leadership of their faith passed to the prophet Muhammad's closest adviser after the prophet's death and thereafter has passed through election. *Id.* Shi'a Muslims, on the other hand, believe leadership passes via the prophet's bloodline. *Id.* The name of the Shi'a branch of Islam is sometimes spelled "Shia," "Shi'i," or "Shi'ite." *Id.* at 1833 n. 4. This spelling variation is reflected in the pleadings and exhibits; for simplicity, this Court will use the spelling "Shi'a."

[4] This Memorandum Opinion cites to pagination assigned through the Court's electronic docketing system.

[5] The parties do not specify the nature of the "prayer material" allegedly kept from Ryidu-X. In his supplement, Ryidu-X cites a January 25, 2018 letter from Administrative Officer Audrey Brown concerning DOC policy OPS.140.0002.14(H)(6) prohibiting prisoners from storing

("DOC") and by the Warden, Acting Warden, Chaplain, and an unknown individual working at the Maryland Correctional Institution-Hagerstown ("MCI-H"), where Ryidu-X previously was incarcerated prior to his transfer to ECI in November of 2017. Ryidu-X stated such denial violated the First, Eighth, and Fourteenth Amendments, the Religious Freedom Restoration Act ("RFRA"), and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Because the issues contained in the new lawsuit were closely aligned with Ryidu-X's previous lawsuit, they were consolidated under Civil Action No. CCB-18-2213. *See* Order of August 28, 2018, ECF No. 10; *see also* Supplement to the Complaint, ECF No. 11.

Prior to consolidation Foxwell had been directed to respond to the emergency injunctive relief request concerning the denial of commissary items filed in Civil Action No. CCB-18-2213. *See* ECF No. 7; *see also* Show Cause Order of August 24, 2018, ECF No. 9. Foxwell responded to the commissary denial issue and also responded to a second injunctive relief request contained in Civil Action No. CCB-18-2641 concerning a 12-week denial of hygiene items by MCI-H personnel. ECF No. 15. Injunctive relief was denied by Order dated September 24, 2018, and Ryidu-X was given 21 days to amend his complaint to provide facts and information as to how and when each named defendant violated his civil rights. ECF No. 17. When he failed to timely comply, the consolidated action was dismissed without prejudice. *See* Order of October 23, 2018, ECF No. 19. The consolidated action was reopened after Ryidu-X informed the Court that he did not receive the September 24, 2018 Order, *see* ECF No. 20, and Defendants were ordered to address the merits of the Complaint, as supplemented, ECF No. 21.

---

religious oil for personal use. *See* ECF No. 11-1. Oil is the only "material" referenced in the parties' submissions, and the Court assumes it is the "material" at issue in this case.

Defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF No. 24, with supporting materials, ECF Nos. 24-2, 24-3, 24-4, 26-1, 26-2, 26-3, which is opposed by Ryidu-X.[7] ECF No. 29. The pending Motion may be decided without a hearing. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated below, the Motion, construed as a Motion for Summary Judgment, will be granted in part and denied in part.

## The Parties' Allegations and Assertions

### I. Ryidu-X's Allegations

Ryidu-X's allegations extend on a timeline from September 2017 through 2018, during which he was housed at two DOC facilities, MCI-H and ECI. His claims focus on access to religious materials and commissary items, which he claims are denied to him because he is a Shi'a Muslim.[8] He complains that on September 20, 2017, while he was housed at MCI-H, Chaplain

---

[7] In his opposition, the plaintiff moves to strike the defendants' response in part, citing Fed. R. Civ. Proc. 12(f) and asserting that it is false and scandalous for the defendants to claim he seeks religious prayer ceremony materials for personal, rather than religious, use. ECF No. 29 at p. 1. For reasons apparent herein, the request to strike is denied. Ryidu-X also seeks partial summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56(a) on the basis that the defendants "have conceded and confirmed that [he] is infact (sic) denied access to the observance and practice of his religion . . . simply because he is a Shiite Muslim who refuses to convert to Sunni at their demand." ECF No. 29 at p. 2. As discussed herein, the pleadings do not support this statement, and Ryidu-X's request for summary judgment will be denied.

[8] Ryidu-X also complains that the contractual commissary provider, Keefe Commissary, is permitted to deduct funds from prisoner accounts but fails to refund the money if the commissary items ordered are not provided. Keefe does not appear to be a "state actor" amenable to a civil rights action and is not named in this suit. Ryidu-X provides an Administrative Remedy Procedure ("ARP") grievance form dated July 6, 2018, relating to Keefe's failure to provide products for which deductions were made to his account, suggesting it is indicative of the "harassment" he experiences daily at ECI. ECF No. 1-1 at pp. 3–4. Other grievances concerning harassment based on failure to submit a commissary slip on June 3, 2018; concerns about Ryidu-X's financial statement and receipt of a money order, and problems with breakfast distribution, naming individuals who are not a party to this action; and the wrongful deduction of money for a medical co-pay, are detailed in ARP ECI-1245-18 and an ARP form dated February 16, 2018. ECF No. 1-1 at pp. 1–2, 5. These matters are not directly related to Ryidu-X's underlying claims concerning religious discrimination and the denial of hygiene materials and are not addressed here.

Felton informed him that as the only Shi'a Muslim he would no longer be allowed access to the observance and practice of his religion, including access to prayer materials. ECF No. 11 at p. 3. Ryidu-X states that Chaplain Felton advised him that access to religious materials would only be provided to Sunni Muslim prisoners and would be kept for storage by the MCI-H correctional officials. *Id.* Those materials will be distributed to the Sunni Muslim inmates upon their request. *Id.* Plaintiff further claims that Chaplain Felton stated he will personally enforce this policy. *Id.*

When transferred to ECI in Westover, Maryland in November of 2017, Ryidu-X states he was told by Protective Custody Unit Manager Lt. Dunaway that the MCI-H policy of disallowing him access to the observance and practice of the Shi'a Muslim religion is also followed at ECI. *Id.* at 4. He states he was told that Shi'a Muslim religious services would not be arranged until other Shi'a were present and a minimum of four to ten participants would be required before services were held. He was also told he could participate in Sunni Muslim religious services. *Id.*

Ryidu-X also claims the denial of personal hygiene materials lasted a total of twelve weeks and was intended as punishment, *id.*, and claims that Officer Dunaway and Warden Foxwell told him that his inability to obtain these items was "simply a glitch in the system," ECF No. 7 at p. 2. Ryidu-X states he sold or traded his meals to obtain hygiene items or borrowed them from other prisoners. *Id.* Ryidu-X claims that the named officers knew he lacked hygiene items but none offered an alternative way for him to obtain these supplies, such as providing them through the welfare commissary or directly from prison supplies. *Id.* He names Officer Jones for the denial of his access to the institutional commissary to purchase personal hygiene supplies on June 3, 2018. ECF No. 20 at p. 5. Ryidu-X names Officers Allen, Wilson and Atkins for the denials of his purchases of personal hygiene supplies on June 18 and 25; July 2, 9, and 30; August 6 and 13;

and October 22, 2018. *Id.* Ryidu-X alleges that these Defendant officers' conduct amounted to retaliation, harassment and punishment because of his present legal action. *Id.*

In his November 2, 2018, Supplemental Complaint/Motion to Alter or Amend Judgment Ryidu-X states that in the past he could attend Shi'a Muslim religious services because other prison chaplains, religious leaders, and prison supervisory staff recognized and allowed for the separate and equal treatment of both Shi'a and Sunni Muslims. ECF No. 20 at p. 4. He references a February 13, 2015, letter as proof that in the past he had been able to obtain religious oil used in accordance with Shi'a religious practices. ECF No. 20-2.

Ryidu-X names MCI-H Warden Gelsinger and Chaplain Felton for their "order and intentional act" of denying and discontinuing access to Shi'a Muslim religious services and practices. ECF No. 20 at p. 4. Ryidu-X states that the defendants claimed they were enforcing policies mandated by the Commissioner of Corrections. *Id.* Ryidu-X also claims that ECI Warden Foxwell, ECI's Chaplain (whose name is not specified), and Officer Dunaway barred Ryidu-X's participation in all Islamic religious services or practices, including participation in official observance of the Feast of the Holy Month of Ramadan, unless and until he converted to the Sunni Muslim faith. *Id.* at 5.

## II.    The Correctional Defendants' Response

The Correctional Defendants argue that Ryidu-X failed to complete administrative review of his claims, thus precluding this Court from examining those claims. ECF No. 24-1 at p. 15. The defendants further contend that they violated neither Ryidu-X's First Amendment rights nor his rights under RLUIPA, *id.* at p. 17, 19; that Ryidu-X did not sufficiently support his Eighth Amendment claim, *id.* at p. 23; and that he failed to plead with specificity claims against certain

6

named defendants, *id.* at p. 24–25. Finally, the defendants claim that they are entitled to qualified immunity from a claim for damages. *Id.* at p. 25.

Defendants provide a Declaration from IGO Administrative Officer Samiyah Hassan in support of their claim of administrative non-exhaustion. ECF No. 24-4. Hassan provides documents showing that Ryidu-X properly completed relevant administrative review of one grievance concerning religion while housed at MCI-H. *Id.*

On October 17, 2017, Ryidu-X filed ARP MCI-H 0343-17 complaining that Chaplain Felton was discriminating against the Shi'a faith. ECF No. 11-3. From the Commissioner's response, it appears the discrimination claim arose because prayer oil was provided only to those participating in congregant worship services. *See id.* (ARP MCI-H 0343-17 and related appeals). On December 11, 2017, the IGO received the matter, IGO 20171879, for review, which it dismissed on January 25, 2018, based on the prison's compliance with the dispensing of oil as governed by the Religious Services Manual. ECF No. 24-4 at p. 3.

Ryidu-X also filed ARPs while at ECI. On July 5, 2018, Ryidu-X submitted grievance ARP ECI-1245-18 concerning a plethora of complaints regarding Officer Green's lack of action to address missing food items during a lockdown, a lost money order and letter from a family member, an unidentified officer who collected his commissary slip on June 3, 2018 but failed to submit it, a lack of access to his prison account to determine whether funds had been "misappropriated," and the failure to unlock his cell so he could participate in his assigned prison job. ECF No. 1-1 at pp. 1–2. ARP ECI-1245-18 was dismissed on June 27, 2018, because the complaint contained multiple unrelated issues. ECF No. 15-1 at p. 16. The IGO dismissed Ryidu-

X's appeal of the dismissal on November 21, 2018, for failure to exhaust the ARP process. ECF No. 26-1 at p. 2.[9]

On August 8, 2018, Ryidu-X submitted grievance ARP ECI-1725-18, alleging that his request for a copy of his financial record had been ignored or denied. ECF No. 26-2 at p. 10. After investigation, Warden West denied relief, stating that he had been issued a copy of his account forms on October 25, 2018. *Id.* With the exception of the claim concerning an officer's alleged failure to submit a commissary request in June 2018, these grievances are not before the Court and are not addressed here.

IGO No. 20181347, filed October 17, 2018, concerned Ryidu-X's claim in ARP ECI-1378-18 that he was denied the opportunity to practice Shi'a Islam. It was administratively dismissed on November 28, 2018. ECF No. 26-1 at p. 2. On December 11, 2018, Ryidu-X filed IGO No. 20181917, which appears to be a resubmission from the disposition of ARP ECI-1725-18. As of January 10, 2019, the matter remained pending with the IGO. *Id.*

Defendants confirm that Ryidu-X is the only Shi'a Muslim adherent housed at ECI. ECF No. 24-1 at p. 7. They state that Officer Dunaway properly referenced the Religious Services Manual, § .07, ¶ D, subparagraph (12) to explain that Ryidu-X cannot have his own religious services and that at least three fellow Shi'a Muslims would be needed before religious services would be provided. *Id.* They state that Dunaway did not mandate that Ryidu-X become a Sunni practitioner, but merely suggested he could join the Sunni worshippers to accommodate his request to have congregant worship. *Id.* They stress that Ryidu-X is not prohibited from practicing his religion, merely that they would not impede his ability to attend Sunni services should he choose

---

[9] Defendants do not provide a copy of the IGO decision. Ryidu-X, however, does not challenge Declarant Hassan's statement that such dismissal occurred.

to do so. *Id.* The defendants also argue that while he was at MCI-H, Ryidu-X was no longer permitted to keep religious oil in his cell based on the directives on the use of oil only during congregant worship, as provided in the Religious Services Manual - OPS.140.0002.14. *Id.* at p. 8.

Defendants note that the contractual commissary provider, Keefe Commissary, is aware that Plaintiff uses his new legal/religious name in his transactions. *See* Memorandum, ECF No. 15-1 at p. 2; *see also* ECF No. 15-1 at pp. 3–15. He has received multiple commissary purchases that include personal hygiene products and stationery materials. *See* Declaration of Larry Adkins, ECF 15-2 ¶ 5; *see also* ECF No. 15-1 at pp. 12–15 (documentation of Ryidu-X's multiple transactions with Keefe Commissary).

### III.    Ryidu-X's Opposition Response

Ryidu-X takes issue with the defendants' assertion that his "access to religious prayer ceremony materials was/is denied due to some sort of 'personal use,'" ECF No. 29 at p. 1, and states that his status as the "lone believer in the Shi'a faith" is false,[11] ECF No. 29 at p. 2. He states that he alone is denied an opportunity to receive religious meals, meet with religious leaders, and observe religious holidays. *Id.* He reiterates that adherents of other faiths have their religious and prayer ceremony materials stored by the prison and distributed as needed, an opportunity that is not afforded to him because he is the sole Shi'a practitioner at ECI and thus unable to participate in congregate worship with others.[12] *Id.* at p. 3. He also argues that the only conclusion to be

---

[11] Ryidu-X provides no information to rebut the defendants' assertion that he is the sole Shi'a adherent at ECI, such as the name(s) of other practicing Shi'a Muslims.

[12] Ryidu-X references a settlement agreement suggesting he is to be confined to segregation in a single cell for the duration of his incarceration. The agreement is not provided and cannot be obtained from the electronic docket of that case, *Ryidu-X v. WCI, et al.,* Civil Action No. WDQ-08-558 (D. Md.). He argues that his segregation status further supports his request to have "access to . . . prayer ceremony materials allowed any and all other inmates of religious faiths." ECF No. 29 at p. 3.

drawn from the denial of hygiene materials over a three-month period is that the defendants, who failed to mitigate the situation, intended to inflict punishment and harassment on him. ECF No. 29 at pp. 4–5.

## Standard of Review

In their motions, Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) or summary judgment pursuant to Federal Rule of Civil Procedure 56. To defeat a motion to dismiss under Rule 12(b)(6), the Complaint must allege enough facts to state a plausible claim for relief. *See Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus,* 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal,* 556 U.S. at 678. The Court must examine the entire Complaint and consider its factual allegations as true, then construe those factual allegations in the light most favorable to the plaintiff. *See Albright v. Oliver,* 510 U.S. 266, 268 (1994); *see also Lambeth v. Bd. of Comm'rs of Davidson Cty.,* 407 F.3d 266, 268 (4th Cir. 2005). Where, as here, the defendants also have submitted exhibits with their motion to dismiss, such evidence is considered by considering the motion as a motion seeking summary judgment, Fed. R. Civ. P. 12(d), and by giving the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

Under Rule 56, summary judgment is granted if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing the motion, the district court must view the facts in the light most favorable to the

10

nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986), and may rely only

on facts supported in the record, *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514,

522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the

governing law," *Anderson,* 477 U.S. at 248, and a dispute of material fact is "genuine" if sufficient

evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party,

*id.*

## Analysis

The defendants raise the affirmative defense that Ryidu-X has failed to exhaust his

administrative remedies, except for his claims concerning the use of religious oil and denial of the

opportunity to practice Shi'a Islam. The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C.

§1997e, provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983
> of this title, or any other Federal law, by a prisoner confined in any jail, prison,
> or other correctional facility until such administrative remedies as are available
> are exhausted.

42 U.S.C. § 1997e(a). For purposes of the PLRA, "the term 'prisoner' means any person

incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or

adjudicated delinquent for, violations of criminal law or the terms and conditions of parole,

probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and

does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust

administrative remedies is an affirmative defense to be pleaded and proven by the defendants. *See*

*Jones v. Bock,* 549 U.S. 199, 215–16 (2007); *see also Anderson v. XYZ Correctional Health Servs.,*

*Inc.,* 407 F.3d 674, 682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may

not be considered by this Court. *See Bock,* 549 U.S. at 219–20. In other words, exhaustion is

mandatory. *Ross v. Blake*, 136 S.Ct. 1850, 1856–57 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Id.* (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion")).

A prisoner must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 725, 729 (4th Cir. 2008). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original)). But, the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has an established "administrative remedy procedure" ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann. (2008 Repl. Vol.), Correctional Servs. ("C.S."), §§ 10-201; Md. Code Regs. ("COMAR") § 12.02.28.02(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance" to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR § 12.07.01.01(B)(8). Moreover, "[a] court may not consider an

12

individual's grievance that is within the jurisdiction of the [Inmate Grievance] Office or the Office of Administrative Hearings unless the individual has exhausted the remedies" set forth in C.S. Title 10, Subtitle 2. C.S. § 10-210(a).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. C.S. § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b). There is an established administrative remedy procedure process that applies to all Maryland prisons. *See* COMAR §§ 12.02.28.01(A)–(B)(2)(b). When the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO. COMAR § 12.02.28.01(C).

The ARP process consists of multiple steps. Step one requires a prisoner to file his initial ARP with his facility's "managing official," COMAR § 12.02.28.05(D)(1), which is defined by COMAR § 12.02.28.02(B)(14) as "the warden or other individual responsible for management of the correctional facility" and defined under C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR § 12.02.28.09(B).

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP, COMAR §§ 12.02.28.14(B)(5)(a)–(b), or fails to respond to the ARP within the established time frame, COMAR § 12.02.28.14(B)(5)(c). The prisoner has 30 days to file an appeal to the Commissioner of Corrections. COMAR § 12.02.28.14(B)(5).

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.[13] COMAR § 12.02.28.18; C.S. § 10-206(a); COMAR § 12.07.01.05(B). When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR §§ 12.07.01.04(B)(9)(a)(i)–(iv). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see also* COMAR §§ 12.07.01.06(A)(1)–(B)(6). An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208(a); COMAR §§ 12.07.01.07(A)(1)–(3). The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR § 12.07.01.07(D); *see also* Md. Code Ann., State Gov't § 10-206(a)(1).

A decision of the administrative law judge ("ALJ") denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(ii); COMAR § 12.07.01.10(A)(2). However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* COMAR §§ 12.07.01.10(B)(1)(a)–(5); *see also* C.S. § 10-209(b)(2)(c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his or her remedies. *See* C.S. § 10-210(a). An inmate need not

---

[13] If the Commissioner fails to respond, the grievant shall file an appeal within 30 days of the date the response was due. COMAR § 12.07.01.05(B)(2).

seek judicial review in state court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see also Moore*, 517 F.3d at 725 (explaining that exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *See, e.g., Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003) ("The exhaustion requirement under the PLRA has been interpreted to require prisoners to pursue administrative grievances until they receive a final denial of their claim, appealing through all available stages in the administrative process.").

A prisoner need only exhaust "available" remedies. *See* 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 136 S.Ct. at 1855, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." In particular, the Court rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 1856–57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855. "[A]n administrative remedy is not considered

15

to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore,* 517 F.3d at 725.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. *Kitchen v. Ickes,* 116 F. Supp. 3d 613, 624 (D. Md. 2015) (citing *Neal v. Goord,* 267 F.3d 116, 121–22 (2d Cir. 2001) (overruled on other grounds)), *aff'd,* 644 F. App'x 243 (4th Cir. 2016); *see also Freeman v. Francis,* 196 F.3d 641, 645 (6th Cir. 1999) ("The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit.").

It is clear from the record evidence that Ryidu-X failed to exhaust his administrative remedies as to claims involving the prison commissary, as he did not pursue ARP grievances concerning commissary problems through all levels of administrative review including the IGO. While his claim that his commissary slip was not collected on June 3, 2018 was submitted for IGO review, Ryidu-X's ARP grievance concerning the incident was filed on August 8, 2018, more than

16

two weeks after the filing of this lawsuit. *See* ECF No. 26-2 at p. 10. As stated above, exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. *See Kitchen*, 116 F. Supp. 3d at 624. Ryidu-X's claims concerning commissary purchases cannot be considered and are dismissed without prejudice,[14] as are Defendants Jones, Allen, Wilson and Atkins, who may have played a role in the receipt and processing of Ryidu-X's commissary requests.

Ryidu-X's claim concerning his ability to exercise his religion is administratively exhausted and shall be addressed on the merits. While "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system," *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnson*, 334 U.S. 266, 285 (1948)), "convicted prisoners do not forfeit *all* constitutional protections by reason of their conviction and confinement in prison," *id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)) (emphasis added). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). That retained right is not unfettered. As a threshold matter, to state a claim for violation of rights under the Free Exercise Clause, Ryidu-X "must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion." *See Wilcox v. Brown*, 877 F. 3d 161, 168 (4th Cir. 2017)

---

[14] Although the question of commissary cannot proceed, the Court notes that in several instances the ARP responses stating that commissary items were ultimately received failed to take into account that *all* the requested items, specifically soap, were *not* included in the package provided to Ryidu-X. While Ryidu-X was not physically injured and was able to obtain soap from other sources, it appears his grievances concerning "hygiene materials" were valid in part.

(citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). A substantial burden is placed upon a prisoner's religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* Nevertheless, prison restrictions that impact on the free exercise of religion but are reasonably related to legitimate penological objectives do not run afoul of the constitution. *See Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

Ryidu-X's religious practices are provided even greater protection under RLUIPA.[15] In relevant part, RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ..., even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005); *see also Holt v. Hobbs,* 135 S.Ct. 853, 860 (2015); *Smith v. Ozmint,* 578 F.3d 246, 250 (4th Cir. 2009); *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir. 2006). Enactment of RLUIPA restored religious free exercise

---

[15] RLUIPA does not support a claim for monetary damages against state officials like Defendants. *Sossaman v. Texas,* 563 U.S. 277, 293 (2011) (holding that acceptance of federal funds by States does not amount to consent to waiver of sovereign immunity to RLUIPA claims for monetary damages against state employees in their official capacities); *Rendelman v. Rouse,* 569 F.3d 182, 189 (4th Cir. 2009) (holding RLUIPA does not authorize a claim for money damages against a state employee sued in their individual capacity). As such, Plaintiff's only potential remedies under RLUIPA are equitable.

rights to prisoners similar to those enjoyed by those who are not incarcerated. *See Cutter*, 544 U.S. at 715–17.

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A); *Holt,* 135 S.Ct. at 860; *Smith,* 578 F.3d at 251. Under RLUIPA, the prisoner initially must show that the challenged policy substantially burdens his exercise of his religion. *See* 42 U.S.C. § 2000cc–2(b); *Holt*, 135 S.Ct. at 862. A prison regulation imposes a substantial burden when it places "substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Lovelace*, 472 F.3d at 187 (quoting *Thomas*, 450 U.S. at 718), or "forces a person to choose between following the precepts of [his] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of [his] religion . . . on the other hand," *id.* (quoting *Sherbert* v. *Verner*, 374 U.S. 398, 404 (1963)). While Ryidu-X need not prove that the practice at issue is "required or essential to his [or her] religion" he must at least "demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to [his] religious practice." *Tillman v. Allen*, 187 F. Supp. 3d 664, 673 (E.D. Va. 2016) (quoting *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007)). One factor in determining whether a prison regulation results in a "substantial burden" is "whether the inmate retains other means for engaging in the particular religious activity." *Id.* at 674 (internal quotations omitted).

RLUIPA "prescribes a shifting burden of proof for inmate religious exercise claims." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015). A prisoner must initially "demonstrate that the prison's policy exacts a substantial burden on religious exercise," and then "the burden shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Id.* Prison security is a compelling interest. *Cutter*, 544 U.S. at 725, n. 13.

Courts "are ill equipped to deal with the increasingly urgent problems of prison administration and reform" and must exercise restraint in cases dealing with the administration of prisons. *Procunier v. Martinez*, 416 U.S. 396, 405 (1974). Deference is given to prison administrators who must regulate the prison while balancing the prisoners' rights to free exercise of religion with the maintenance of the security of the institution. *See Cutter*, 544 U.S. at 723. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply [RLUIPA's] standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline consistent with considerations of costs and limited resources." *Id.* (citing legislative history).

Additionally, where a plaintiff is unable to sustain his RLUIPA claim, there is no need for the court to separately consider the claim under the First Amendment, as the claim will necessarily fail there too. RLUIPA provides more protection for an inmate's religious exercise than the Free Exercise Clause. *See Lovelace*, 472 F.3d at 198 ("RLUIPA incorporates and exceeds the Constitution's basic protections of religious exercise.").

The parties do not dispute that Ryidu-X holds a sincere adherence to the Shi'a Muslim faith. But there also is no credible dispute that he is the sole Shi'a practitioner at ECI, so there is no issue for the court to decide about congregant worship. Further, there is no evidence that suggestions by corrections personnel that Ryidu-X might join Sunni worship services were intended to coerce Ryidu-X into rejecting his faith, which differs fundamentally. Questions do remain, however, as to the use of oil during religious practices, how frequently that practice might occur, and whether some accommodation can be made available to Ryidu-X to provide him limited access to oil during the necessary practice of his faith.

As a final matter, Ryidu-X suggests that he has suffered harassment and retaliation for exercising First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that a prisoner's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017).

A plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500 (internal quotation marks omitted)). A plaintiff also must demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was

aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.* Ryidu-X has not exhausted a retaliation claim through the administrative grievance process, however, and he presents no compelling factual basis to pursue such a claim here.[17]

For the reasons noted herein, Defendants' dispositive motion will be granted in part and denied in part. Plaintiff's claims concerning the denial of commissary/hygiene items and retaliation/harassment will be dismissed without prejudice; Defendant Maryland Division of Correction will be dismissed; Defendants Jones, Allen, Wilson and Atkins will be dismissed without prejudice; and summary judgment will be denied as to the remaining Defendants with regard to Plaintiff's claims regarding his right to practice his religion through the use of prayer oil. Plaintiff is granted 21 days to move for appointment of counsel.

A separate Order follows.

___8/27/19___
Date

_____
Catherine C. Blake
United States District Judge

---

[17] The Court reserves its ruling on the doctrine of *respondeat superior* and qualified immunity pending further submission by the parties.